One, six, three, four, Rambus B. Capos, or not Capos anymore. Ray. Yeah, I thought it shouldn't be Capos anymore. Rambus B. Ray. Yeah, I thought it shouldn't be Capos anymore. Mr. Barney, you may proceed. Thank you, Your Honor. May it please the Court. The board in this inter-parties re-examination made three errors, and the first one I'd like to discuss this morning is its obviousness ruling. That ruling affects all of the claims on appeal. This case presents an opportunity for this Court to... Well, when you say it affects all the claims on appeal, that was an alternative basis. So if we were to uphold anticipation, some of the claims go down, even if we thought obviousness was all wrong, and I agree with you, right? That's correct, Your Honor. So it does affect them all, because they were all, some of them were double whammied. That's correct. Anticipation and obviousness. And just, you know, since you brought the point up, I wanted to make sure it's clear that all of the claims were rejected for obviousness. And so it is true that if you're, if the panel affirms on obviousness, then they need not reach anticipation. I know you've got a lot to say about obviousness, but I'm on the obviousness issue. Again, assuming that we are looking at the claims that were not also rejected on anticipation grounds, I was kind of surprised after the red brief argued that you didn't really point out anything in the other claims where there were limitations that you felt were meaningful and non-obvious. So I've gone through those claims and tried to find what those additional limitations are. Are those limitations things that one of ordinary skill in the art would not have understood, assuming that your primary argument as it relates to obviousness were to fall away because of the anticipation issue? Right. So we use Claim 1 as a representative claim, and the government is correct, the PTO is correct that it is representative. All of the limitations that are at issue in this appeal are in that Claim 1. The other claims that were not rejected for anticipation have other limitations that did distinguish it from Inigaki, and nobody's challenging that. However, the limitation at issue that we believe the court made the error on is also a limitation that exists in Claim 1, which is the double data rate limitation. And that's why Claim 1 is representative of all the claims on appeal. It's just that you have to look at both obviousness and anticipation for that claim to fully resolve the case. To be clear, you're not separately arguing dependent claim limitations? That's correct, Your Honor. Okay. So if we affirm on anticipation, then the obviousness portion becomes moot? The other way around, Your Honor. Well, I know it normally wouldn't if there were limitations that were meaningful in the other dependent claims. Well, there's another set of claims that have an independent claim that is independently distinguishable from Inigaki, and nobody disputes that. That's the one starting at 26? Yes, Your Honor. Okay. Does that answer the question, I hope? All right. Okay. So I believe this case on obviousness presents an opportunity for the court to further define the substantial evidence standard as it applies to findings of fact made by the Board in the first instance on appeal. And there are two things that make this case meaningful. Aren't you really arguing then that this is a procedural error because it's effectively a new ground of rejection? You seem to dance around that and never actually say that is your argument. Like, I don't see citations to leaf them, Judge Lincasey wrote, on new ground of rejection or anything. Isn't that really the heart of what you're arguing? These are new grounds of rejection. This is not what the examiner based his rejection upon, and therefore it's erroneous. I think that's a subtext of the argument. But it's really subtext. Why isn't it actually ever stated anywhere in your brief? Well, Your Honor, I mean, we chose the substantial evidence standard to highlight the fact that because the Board went a different direction than the examiner, and because there's no evidence in the record to support the direction the Board went, that in and of itself under the substantial evidence standard should be grounds for reversal. That doesn't necessarily explain overlooking the head-on issue of the new ground of rejection argument. It would have been better if you focused on that. At least we would have paid more attention. Instead, we have to find that out ourselves and help you out. I apologize, Your Honor. Nevertheless, I do believe that there is an issue here with respect to findings of fact by the Board, where the other side, the original requester in the case, did not put on any expert testimony at all, not to support obviousness or any other reason. So that's one unique factor in the case. And the other, as Your Honors have alluded to, is the fact that the examiner's original rationale for the combination of IAPX and Inigaki is undisputedly incorrect. Nobody is disputing that his rationale is incorrect. He believed erroneously that there are unused clock edges in IAPX, and in fact there are not. So we have a situation where when it got to the Board, the Board was essentially forced to abandon the original rationale for combining the references, and it then proceeded to come up with several different hypotheses as to how a person of ordinary skill in the art in 1990 might have hypothetically modified IAPX. But the problem, as I've mentioned, is that there was no expert testimony in the record to support any of those hypotheses. I also had some difficulty with the Board's discussion of the secondary considerations, and in particular the recognition of the invention and commercial success aspects. What do you have to say about that? Your Honor, we agree, obviously. From my personal opinion, I think that secondary factors sometimes get short shrift at the Board, and perhaps in many cases that's appropriate. It very often seems to be almost a rote response, that you haven't shown Nexus, you haven't shown Nexus, you haven't shown Nexus. Well, in this case, there was some pretty clear Nexus, because we had very specific praise in the industry, particularly from our competitors, Micron, specifically stating that the combination of synchronous memory device with double data rate was a big deal, was a big innovation. And that wasn't us saying it, it was our competitors saying it, who are now licensees. And I think that perhaps... Well, I don't know about Judge Lynn, but I guess what I was thinking of in terms of my concerns about the treatment of secondary considerations was more of a potential legal problem than a re-weighing of the weight that ought to be given to them. In particular, the commercial success. Do you think that the Board made any legal errors in the way that it framed the requirements to establish commercial success? Well, I certainly think that the Board erred in assuming that there was no Nexus. One of the things that the Board did, as we explained in the brief, was sort of set those aside, because we were relying on licenses, and we did cite the case law that says, of course, there are situations where licensing activity can be... I guess I'm hiding the ball a little too much, because I thought you'd know right where I was going. What I was going to say is, what caused me some concern was the statement in particular by the Board that you don't get commercial success because you haven't shown evidence of success that spans the full range of the claims. And that, to me, seemed like a straightforward legal error. If I had a genus-species situation, I don't have to, in order to get proof or have value given to my commercial success, evidence show that I've enabled and sold a product and it's been successful in the entire genus, right? Yes, Your Honor. A genus-species would be enough. I do. I thought that... It's a big case. It's okay. I do agree with that. And also, there seemed to be similar errors in the fact that the Board was saying that whatever success we've shown, whatever praise we've shown, does not commensurate in scope with the claim and would point to things like, well, we're touting the fact that these devices are faster and better, but our claims don't have limitations that specifically go to speed. And I also think that's erroneous because most claims aren't written that way. Most claims don't have all of the features touted, even though the claim itself may be specifically geared towards a device that does improve that function. And the spec, throughout the spec, it talks about how this increases the speed with which... Absolutely. And a person of ordinary skill in the art world would absolutely realize that our invention is all about speed. And so I thought that was also erroneous, as we pointed out in our brief. In our reply brief, I would like to just go back to this obviousness issue. In our reply brief, we did provide a chart showing all of the appellate findings of the Board and how those findings were not supported by substantial evidence. Very often, the Board made a finding on appeal in the first instance and cited it either nothing or cited to NVIDIA as a field brief. I don't know what to do here. Suppose that I were to agree with your assertion, which is one of the first things I asked you, which is that this is, in fact, effectively a new ground of rejection. Well, when the Board issues a new ground of rejection, which they're allowed to do, there is the opportunity for the development of a record which would then be able to support the new ground of rejection on their part and give you an opportunity to respond to why that new ground of rejection is not proper. And if I were to agree with you that that is what this is and it didn't occur here, not surprising the record might not support it because they jumped ahead. And so wouldn't the answer be to vacate and remand? Why, since it is a new ground of rejection, why do you think, even if you're right, that there isn't evidence to support this, I guess what more are you going to get? You think a straight reversal, they haven't proven it? Your Honor, first of all, I do agree with you on the new ground of rejection analysis that if that is the way that the case is analyzed, the proper remedy would be to remand for further development of the record. One point, just to point out that NVIDIA, the reason that the PTO is here and not NVIDIA, NVIDIA has dropped out of the case. They dropped out after their briefing on appeals, so their briefs were considered for the appeal, but they are no longer part of this case. And part of the settlement was don't participate, right? Yes, of course. I hope I didn't just reveal something. So I'm agreeing with you, but I also think that under a straightforward substantial evidence review, the way the case is situated at this point, that because there is not substantial evidence to support the findings, I also think reversal would be appropriate. And we cited this specifically to the Brand v. Miller case, which I think is very appropriate here. And the Brand v. Miller case specifically looked at this problem of when can a board rely on its own expertise for findings and when can it not? And what this court said in Brand v. Miller is in a contested case such as where there's two parties, two private parties in the case, the board is playing a different role than it does in an ex-party proceeding. And it can't simply manufacture its own evidence. In other words, its own opinions don't become self-supporting. It has to look to what the parties put on the record. And here NVIDIA put in no expert testimony, not on obviousness and not on anything else. So there's really nothing in the record that could support the board's alternative reasoning. With respect to that point, and that is the context with which we are in, do you see a difference between the way the board should approach objective initia in a contested proceeding like this where the patent is already issued versus in an initial examination? You're talking about the objective initia of non-obviousness? Yes. Well, certainly there's a different claim construction methodology, we already know that. And if you're asking me personally, yes, I do think, because when the patent has expired, you're using the claim construction that would be used in a district court. Perhaps we should be thinking about whether there ought to be a presumption of validity as well at that point, because the whole rationale of using the broader construction was that the patentee had an opportunity to amend claims, which you don't have. And I think that the weighing of the objective factors should be the same as it would be in a district court. And as an example, we put in our objective factors, they were never disputed. Nobody ever came in and disputed our objective factors. And I think that should have been weighed more heavily in favor of Ramis. You are well into your rebuttal time, Mr. Barney. You want to save some? Yes, Your Honor. All right. I'm going to restore your whole five minutes. And so Mr. LaMarca, if you need a few extra minutes, whether you want them or not, we'll be happy to give them to you. Let's see. May it please the Court, Your Honors. Just to start out, the Court's addressed this. But yes, in our view, Representative Claim 1 is the only claim that's been argued. And the only features in Claim 1 are the ones that are in dispute. So that's the reason why we put that in our brief, that there really isn't any argument as to any other features in the other independent claims. Well, what about the claims that start at Claim 26 with the seven independent claims? Right. I mean, even those claims, I don't see in the blue brief or the reply brief any argument as to any features that appear in those claims that don't also appear in Claim 1. I mean, that's the point that we were trying to make, is that the fight is about the features in Claim 1. And if the Court agrees with us with respect to the rejections with regard to that claim, then in our view, the other claims ought to collapse because they haven't argued them. Yeah, but there was no rejection of Claim 26 and the dependent claims on 102. So if we affirm on 102, that doesn't necessarily answer the question with respect to the other claims. I understand, Your Honor. So are you arguing essentially a public waiver as to those? Right. I mean, our point is, you're right, Your Honor. The anticipation rejections cover a certain group of claims. Those claims are overlapped with the obviousness rejections. And there's a few other claims that aren't encompassed by the anticipation rejections that are out there dangling. The point is, those other claims that are out there, they haven't argued a specific feature of any of those claims anywhere in their briefs. So that is why we raised it in the brief, in our brief. But I understand your point that the anticipation rejection covers a subset of all the claims, the obvious rejection covers all of them. Nevertheless, if all we're fighting about is features in Claim 1, he's fighting about features in Claim 1 for the anticipation rejections, he's also fighting about features in Claim 1 for all the obviousness rejections. Either way, the rising and falling of Claim 1 should take care of them all. So in other words, just to simplify this, we can ignore the dependent claims for the time being. We've got two independent claims, Claim 1 and Claim 26. Right. But Claim 1 is considered representative for purposes of the arguments presented on both 102 and 103, despite the fact that the examiner never rejected Claim 26 on 103. I'm sorry, on 102. Yeah, correct. It was rejected under 103, not 102. Nevertheless, as you pointed out, for purposes of this appeal and purposes of what's in the briefs, Appellant has admitted, we've agreed Claim 1 is representative. It says it in their brief, I believe, right in the beginning of their blue brief, page 15, Claim 1 is representative. It says it right in the brief. I mean, in my understanding of what that means is it represents all the arguments with respect to all the claims. That's the way we understand that type of position. That's the way we view it. But we are a court of review, Harvey. We're not in a position to say, well, that Claim 1 is representative and Claim 1 was rejected on both 102 and 103, Claim 26, which was only rejected on 103. We can affirm the rejection on 102 and apply it to Claim 26. Well, I'm not asking you to find it. I'm saying that the blue brief admits it. That's what I'm saying. The blue brief says Claim 1 is representative and has not made any arguments with respect to any other features and any other claims. Yes, so go ahead and answer my question before. That's where I'm at. What you're saying is that even if they could have made that argument, they haven't, so there's an appellate waiver because if you don't raise it... Effectively, that's another way of saying the same thing. Yes, Your Honor. Okay. I agree. Why don't you move on to obviousness? Let's move on to obviousness. Well, I think the main argument that Rambis makes is that IAPX, the IAPX reference, which is the basis for the obviousness rejection, it basically has all the features. The only feature that it's missing is using the downside, the falling edge of a clock signal to help increase the data rate. That's the only thing that's missing. What the examiner and the board both said consistently is that the Inigaki reference specifically teaches that. It says you can use both the rising and the falling edge of an external clock, and if you use both edges instead of a single edge, you will double the data rate or you will speed up the rate of transmitting and writing data to a memory device. But do you agree that the examiner erred in concluding that there was an unused edge? Right. I think it's correct that there might be... You've got to let me finish my question so that the record reflects it. Sure. Okay, that there was an unused edge in IAPX. I think you're correct, Your Honor, and I think Rambis is correct, that the examiner made a factual incorrect statement about whether or not the other edges of the clocks were being used, but the board corrected that factual determination. But that's exactly the problem. Right. So the problem is the examiner based his motivation to combine. One of skill in the art would know from Inigaki that you can use up and down and get twice as fast, and look, IAPX, they're using only up. That means the down's free. Go ahead and insert the down in. Well, whoa, time out. Down's not free. So that goes to the heart of the rejection. And in my view, if you read the board's decision and you read the examiner's rationale, what you'll find is really there's more to it than that. What the examiner and the board both said is that both of these references are in the same field, the field of digital writing of memory and data transfer. Both of these references seek to do the same thing. They both seek to speed things up, to get more bandwidth, to become more efficient. And you're correct, there's a factual error in there, but nevertheless, the board was very consistent when it said just like the examiner, we agree. Both the AIPX reference as well as the Inigaki reference, they're both seeking to do the same thing. They're both seeking to solve the same problem. What is that problem? We want to go faster. How does Inigaki solve that problem? We use both edges of the clock. Now when I look at AIPX, AIPX does have all these other clocks with all these other edges. The board said, we can use those other clock edges to help do exactly what Inigaki did, which is speed it up. That sounds like a totally different projection to me. Well, it's really not a new thrust of rejection. There is a factual error in there, whether or not the other clock edges were being used for different purposes. That's the point that they make. But the board said, we don't care. Even if they are being used for other more sophisticated purposes, this claim, if you look at the claim, is very, very broad. And this claim only requires a very simplistic rise and fall of the external clock to time or to synchronize the writing of data. That's all it requires. And when you take the IAPX reference, which has clocks, it has external clocks, it has dual edges, we just want to use the edges for a different purpose. What's the different purpose? The different purpose is what Inigaki teaches. So is it your view that rather than create a new ground for rejection that the board was, what, clarifying? Yeah, I think you're correct that there is a slight factual error in what the examiner said when he read the reference. But nevertheless, the rationale and the underlying grounds of rejection, the basis for the rejection, and the reasoning for the motivation,  That part's the same. So in my view, it's not a new ground for rejection. And furthermore, Your Honor, nowhere in their brief do they ever say new grounds of rejection. They do say different reasoning, different position. But by the way, there was never a request for rehearing to the board alleging a new grounds of rejection. There doesn't have to be. They have a right of coming directly to appeal. Nevertheless, if they really believe that that was a new grounds of rejection and the board wrote that, they did have the opportunity, whether it has to be or not. Their brief makes it clear that they believe it's a new ground of rejection. They just want the moon and the stars. They'd like us to reverse and not give you a chance to supplement the record to establish the obviousness based on your new ground of rejection. Okay, well, it's our position that it's not a new grounds, even though we never had that argued to us before. But in our responses, as I explained, we believe the underlying rationale for the reasonings behind why an ordinary artisan would take the teachings of Inigaki, which are very clear and very simple, and it's a really good idea. Let's use both edges of the clock. It'll speed things up. It'll go twice as fast. We have everything else in IAPX except for we're using the downside of the clock for a different reason. Let's just use that for increasing the data rate. That's all. And where are you going to put the different reason? Well, that's in the board. But you can't use the downside of the clock for the different reason anymore because you're not going to make it. Correct. And you're going to lose some functionality in IAPX. And what are you going to lose? You're going to lose other more sophisticated functions. The problem is, how do I know that one of skill in the art would, it would be obvious to them to make that substitution and that they would necessarily know exactly where to put that other functionality that's currently being utilized on the downfalling edge. You don't have to put the other functionality anywhere and the reason is the claim doesn't require it, Your Honor. The claim doesn't require it. No, but the preferences do. You've got to, you're saying, here's an empty seat. Go ahead and sit in it. Except now there's a lady sitting there. We've got to figure out where to put her. Except that lady sitting there, the function she was performing is not required by the claimed invention which means even if we tell that lady to leave the room. But you're asking one of skill in the art to go ahead and sit in the seat to the one of skills looking at it thinking, all right, well in order for me to put my bottom in that seat, I've got to move her. The person with skill in the art can be motivated to make that combination. Look, motivation is much more obvious when there's nobody sitting there. When the down cycle, the falling edge of the clock's not being used, the motivation to go ahead and use it to double the speed is pretty logical and obvious. But when it's actually being used for something else, it makes me question whether one of skill in the art would not only say, okay, well I could use the down cycle but I'd have to figure out where to put all this other stuff first because that's the part you're not addressing. But I don't see any evidence. Well, the board addressed it. The board did address that question. They said, we acknowledge that those clocks, the other sides of those clocks are being used for other functions. However, we don't, in their view, an ordinary artisan would have been able to simplify the IAPX device, which means what? We're not going to use those other functions. We're going to drop some of the bells and whistles. It's like, I've got a car with air conditioning and now I'm going to take away the air conditioning and use the space in the engine compartment for something else, but now I don't have air conditioning anymore. Okay, well I lost the air conditioning, Your Honor. How is that consistent with In Re Cal, K-A-O, which says, quote, the board's own conjecture does not supply the requisite substantial evidence to support the rejection. Well, I don't consider it conjecture, Your Honor. I consider that a factual finding based on the rationale. Where does it come from? The desire of the ordinary artisan to do what? Increase speed, increase bandwidth. Where does that come from? The teachings of the references. That's what the board used as a basis for its reasoning. Furthermore, the board in itself, I think In Re Berg says it, it can use its knowledge to make factual findings not only with common sense, with the way the references teach, the technology that they're in, and everybody knew at the time in this technology, just like these references speak to, that increased bandwidth and increased speed and improving those things were critical and important. So there was a great desire by the ordinary digital chip designer to do this and Inugaki solved it. Inugaki came out in 1981 and told the world, if you use both edges of a clock, you will speed up your system and you'll do it without increasing the chip size. You'll keep the chip small, you'll keep it compact, and you'll make it go faster, and here's a way to do it. Meanwhile, we've got this more sophisticated device over here called IAPX, which has multiple external clocks and multiple chip sizes, and you can use them for that purpose. Here's the problem. You want to say, oh, well, the board has concluded then that you would just abandon whatever functionality is currently occupying the falling edge of the clock. I'll be honest with you. I did read it, and at one point in preparation for this, I knew what it was. I don't remember anymore, but I have this nagging suspicion in my mind, and my law clerk emailed it to me, that that functionality is actually critical for the device to operate. Well, I don't know that that's true. Right. Isn't that why a more developed factual record is necessary? You don't know if it's true. The board didn't tell me anything at all about that, and yet I'm supposed to assume one of the skills in the art which is pluck that functionality away, like your air conditioning unit that you're willing to give up on a 95 to get to a good day, and you're going to pluck it away and get rid of it, and I'm just supposed to assume that your car's still going to work. Well, guess what? That thing is connected in series to a bunch of other stuff that actually matters and makes your car operate. So you can pluck it out, but the functionality isn't going to exist anymore. So would one of skill in the art with that knowledge actually do it? That's the problem with a new ground of rejection. And the board disagrees with you, Your Honor. The board made a factual finding, and they are entitled to deference for that finding if there's evidence. But it's a case of expert testimony. And if there's evidence, where's the evidence? Well, the evidence is in the reference. What is the evidence in the reference that shows if you pluck out the functionality that currently occupies the falling edge of the clock cycle, the device is going to work? Yeah, I mean, the board made that determination. They made that determination. I know, and it's only entitled to deference if there's evidence in the record to support it. And you said the evidence is in the record, Your Honor. So show me in that reference evidence. And my point is if you read this long, very long, extensive reference called 980X, Your Honor,  yes, what the board said is dropping some of these extra elaborate functions wouldn't destroy the reference. In fact, the whole hearing was all about that. If you read the oral hearing before the board, the board asked Rambis, the advocate, multiple times, they said, are you telling us that if we take away, that if we use the other edge of the clock in IAPX that it's going to destroy it? And he said, yes, it's going to destroy it. And he goes, no. Or is it going to become less effective? And ultimately he admitted that it would be less effective, which means it wouldn't destroy it. So the board did inquire into that exact question of the advocate before the board hearing. The board hearing's in the record. You can consult it. It said that. My point is, a less effective device is not an inoperative device. And that's exactly what the board focused on. Was there an expert affidavit in which the expert said that if you did take away that functionality, that it would meaningfully... I couldn't say it was an expert. Would you let me finish my question? That it would meaningfully alter that reference? I don't know if there was an expert. There's no expert testimony that I know of that said it in contrast to that. I don't know of it. No, Your Honor, I don't know. I'm not aware of it. But I don't know if expert testimony isn't required. We have fact findings made by the agency. We have a hearing that occurred before the board. We have questions from the board and answers by the Rambis. We have references that teach the desires of the ordinary artisan to why they would want to make such a modification. That was the basis for their obvious discombination. Well, you're contending that the board made fact findings. Yes. I'm looking at the record and it seems to me the board simply stated its conclusions. Just because the board makes a statement of fact doesn't make it necessarily supported by substantial evidence. Yeah, and the fact findings that they made, Your Honor, was it's clear from the references of both the examiner as well as the board said that the references teach an ordinary artisan has a strong desire to increase the speed. And Inagaki specifically says one way to do that, a good way to do that, is to use both edges of the clock. That's basically the fact findings, Your Honor. From there, they then took those facts... So there's no question about what Inagaki teaches, but there's also some question about whether applying that in combination with the IAPX reference would render the IAPX reference inoperative. Right. And that's the exact question that was before the board during the hearing. And ultimately, if you read the hearing transcript, what you see is the board didn't view it as inoperative. They viewed it as just potentially less effective. In other words, we're giving up some functionality, but it still works. That was the big dispute in the board hearing, and that's what the APJs repeatedly asked about. Mr. Lamarco, we kept you completely on this. I know. But I would like to ask you, because we did touch upon secondary considerations with Mr. Barney. I mean, I think that we've got the anticipation stuff down. So I'm not really going to let you switch over to that if that's where you're trying to go. But if you don't mind, I would like to give you a few minutes, or at least a minute or two, to address the secondary considerations. Yeah, and I think the point that you're making is we understand the GLAT rule. We understand that the secondary considerations don't necessarily, if you have a species as part of a gene, we understand that. However, in this case, if you look at the secondary consideration evidence that they presented, which is in the record, and it's back at A2630, 2632, 2633, 2638, if you look at all of those, what I would call almost press releases, they're really not evidence of sales. These are more evidence of praise in the field. And they were press releases, and they were all around the same date, right around March 16, 1992. It's like a bunch of press releases came out all at the same time, and they all sort of said the same thing. We've got this new technology, and this new technology is going to increase the speed by five to ten times. That's basically what it said. They said, we've got part of our technology a double data rate by using the dual edges. That's part of it. But they also have listed other aspects of their technology, the way they package it, the way the circuit design has worked, all these other features. But it wasn't all Rambis. Correct. Like Micron at 1711. Right. I'm not saying it's just Rambis only, but all of these press releases that came out right around March 1992, all of them do focus upon the degree of the speed increase, like a five to ten fold increase. Our point is, when you look at the claim, the claim doesn't mention a five to ten fold increase. Furthermore, Well, the Micron one doesn't, right? 1711. It says, with revolutionary and pioneering technology enabling applications to transfer data on both the rising and falling edges of a clock signal and vastly improving performance. Right. And if you read all the other press releases in conjunction with that, when they say vastly improved, in all these other instances, they say a five to ten fold increase, a five to ten fold increase, a ten fold increase, ten times faster, a five times faster, ten fold increase. Our point is, if you really wanted to get the benefit of this type of industry praise about a five times or a ten times increase, this claim should have said that. It doesn't say that. The claim doesn't require a ten fold increase. In fact, the prior art, which we put out, I don't even understand your argument right now. Well, that's our point. Our point is that you need to link the industry praise that they're talking about. We're going to increase your speed ten times if you use our new technological advancement. Well, you haven't claimed that. So how can that prove or be evidence probative of, This whole specification is about increasing the speed. And so is Inigaki's. And so is Inigaki's, Your Honor. The prior art encompasses that. Inigaki's awesome too, but why do you suggest that you're saying there's no industry praise here and you're going to discount that evidence? We're not saying that there's not industry praise. What we're saying is this industry praise is because of other features beyond what just Inigaki discloses. This industry praise, On page 1711, the only feature that I see is an expressed discussion of the rising and falling edges of the clock cycle. And if you looked at all the 15 other advertisements that I pointed out to you, almost every single one of those, in conjunction with that one, say that the vast improvement is a five to tenfold increase. Our point is, and for their own expert, Mr. Murphy said, he speaks of other features like the delay phased lock loop aspect, all these other features that are not part of this claim. Now, it could be there's other claims in the other, there's a mid-family of patents. And it could be there's other claims in those other patents that have those features that indeed these advertisements would be germane to. And indeed, they would be probative of non-obviousness in those other claims, but not this claim. This claim is super broad. It doesn't say anything about how fast, how much it's going to increase the speed. It doesn't say anything about delay lock or phase lock loops or any of these other features that their expert speaks about. My point is, when someone goes out and licenses something or buys something, and it has all these other features that are the reasons it's buying it, but those features aren't in this claim, then that's not a nexus. That's our point. That other features were driving the industry praise. Other features were driving the commercial success, the licensing. We might want to settle litigation. The point is, they haven't pinpointed this specific feature as the reasons why all of this secondary evidence was driven. That's our point. I think we understand your point. We probably ought to let Mr. Barney have his rebuttal time. Sure. Thank you very much. You have five minutes on the clock. Mr. LaMarco went longer, so I'll be gracious, but if you need it, why don't you figure out whether you need it? I don't think I do, Your Honor. It's your choice. I just wanted to make one point because I hope I didn't make a mess of the claim rejections and what's at issue here. We tried to clear that up in the footnote we put at the end of our gray brief, but let me just try again just to make sure there's no confusion. There were a total of 15 claims at issue here. Three of them were rejected for anticipation, and all of them were rejected for obviousness. The limitations that separated the claims that were not rejected on anticipation are things like block size and sampling the right request synchronously, which nobody has ever disputed are missing from, I mean, they are missing from Inigaki, and nobody's ever said otherwise. So those claims, if you reverse the obviousness rejection, there's nothing left. I mean, they can't be rejected simply because we use Claim 1 as a representative claim. There never was an anticipation rejection on those claims, and so if you reverse an obviousness, those claims stand. The reason we use Claim 1 as a representative claim is because the only limitation that we are arguing to distinguish the obviousness rejection is the double data rate limitation, which happens to also be included in Claim 1. And so to simplify things, we use Claim 1 as our representative claim to be very clear, both obviousness and anticipation have to be analyzed on that Claim 1. So I hope that clears it up. And unless your honors have any other questions for me, that's the only point I wanted to make. Thank you. Thank both counsels for their argument. The case is taken under submission.